**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **SHATEQUA DEAS**, | ) |
| | ) |
| *Plaintiff*, | ) CIVIL ACTION NO.: |
| | ) |
| v. | ) |
| | ) |
| **TAKEDA PHARMACEUTICALS** | ) JURY TRIAL DEMANDED |
| **AMERICA, INC. AND BAXALTA** | ) |
| **US INC.** | ) |
| | ) |
| *Defendant*. | |

**COMPLAINT**

COMES NOW, Plaintiff Shatequa Deas ("Plaintiff") and sets forth his Complaint for damages and demand for jury trial against Takeda Pharmaceuticals America, Inc. ("Takeda") and Baxalta US Inc. ("Baxalta") (jointly, "Defendants"). Plaintiff respectfully shows this Court as follows:

**INTRODUCTION**

1.    This action is for disability discrimination and retaliation under the Americans with Disabilities Act of 1990 ("ADA") as amended. Plaintiff seeks

declaratory and injunctive relief, backpay, front pay, compensatory damages, punitive damages, liquidated damages, attorney's fees and costs.

## JURISDICTION AND VENUE

2. Plaintiff's claims present questions arising under federal law; thus, jurisdiction is appropriate before this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3. Venue is proper pursuant to, *inter alia*, 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged below were committed within the geographic boundaries of the Northern District of the United States District Court, Atlanta Division, and within the state of Georgia.

4. This Court has personal jurisdiction over Defendants as they are located within the geographic boundaries of this Court and/or conduct business within the geographic boundaries of this Court.

## ADMINISTRATIVE PROCEEDINGS

5. On August 21, 2025, Plaintiff filed timely charges of discrimination and retaliation (Charge No. 410-2025-08514) with the Equal Employment Opportunity Commission ("EEOC") against Takeda.

6.      On February 23, 2026, Plaintiff filed amended charges of discrimination and retaliation (Charge No. 410-2026-06685) with the EEOC against Takeda.

7.      On February 23, 20256, Plaintiff also filed charges of discrimination and retaliation (Charge No. 410-2026-06684) against Baxalta.

8.      On February 27, 2026, Plaintiff received a notice of right to sue from the EEOC for her initial charge (Charge No. 410-2025-08514).

9.      This lawsuit has been filed within 90 days of Plaintiff's receipt of her Notice of Right to Sue letter from the EEOC for her initial charge (Charge No. 410-2025-08514).

10.      Plaintiff has not yet received a notice of right to sue for either of her other charges (Charge Nos. 410-2026-06684 and 410-2026-06685).

## PARTIES

11.      Plaintiff is a resident of Georgia.

12.      Defendants are foreign profit corporations registered to do business in Georgia.

13.      Takeda may be served through its registered agent if service of process is not waived:

Registered Agent Name: **CORPORATION SERVICE COMPANY**
Physical Address: **2 SUN COURT, SUITE 400, PEACHTREE CORNERS, GA, 30092, USA**
County: **Gwinnett**

14.     Baxalta may be served through its registered agent if service of process is not waived:

Registered Agent Name: **CORPORATION SERVICE COMPANY**
Physical Address: **2 SUN COURT, SUITE 400, PEACHTREE CORNERS, GA, 30092, USA**
County: **Gwinnett**

## STATEMENT OF FACTS

1.     Plaintiff was employed by Defendants at all times material to this Complaint.

2.     At all times material to this Complaint, Defendants were joint employers of Plaintiff.

3.     In effect, they each had control over Plaintiff's employment and the terms and conditions of her job.

4.     Upon information and belief, each Defendant had authority to exercise control over the terms and conditions of Plaintiff's employment, specifically but not limited to job assignments, hours, pay, benefits, promotional opportunities, and each had the ability to hire and fire.

5.      Defendants are a highly integrated entity where employees are often unaware of the distinction between the two entities, and Baxalta employees may be managed by employees of Takeda.

6.      Takeda and Baxalta employees meet the definition of the "single employer test" under *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999).

7.      Alternatively, the Defendants contract with each other for the performance of some tasks, and Takeda retains sufficient control over the terms and conditions of employment such that they are "joint employers." See *Virgo v. Riviera Beach Assocs., Ltd*., 30 F.3d 1350, 1359-60 (11th Cir. 1994).

8.      Alternatively, Takeda has delegated sufficient control of some traditional rights over its employees to Baxalta such that Baxalta may be considered an agent of Takeda. This is called the "agency test." See *Lyes*, 166 F.3d at 1341.

9.      At all relevant times, Defendants employed more than fifteen (15) employees for each working day during each of twenty (20) or more calendar weeks during Plaintiff's employment.

10.     Defendants are subject to the anti-discrimination and anti-retaliation provisions of the ADA.

5

11.    Plaintiff was hired on or about June 12, 2023, as a Manufacturing Technician I at Defendants' plasma fractionation facility in Covington, Georgia.

12.    Plaintiff reported to a number of Manufacturing Supervisors, including Darryl Briggs ("Briggs"), Thomas Wheeler ("Wheeler"), John Adams ("Adams"), Alex Santillan ("Santillan"); Manufacturing Manager Shawn Gaines ("Gaines"); and Associate Director of Fractionation Manufacturing Hetal Sonani ("Sonani").

13.    On or about September 5, 2023, Plaintiff sustained a workplace injury and initiated a workers' compensation claim.

14.    Based on her physician's statement and as a direct result of her injury, Plaintiff was placed on a leave of absence on or about October 4, 2023.

15.    During her leave of absence, Plaintiff underwent surgeries on her right hand on December 1, 2023, and her left hand on June 10, 2024, to treat moderate-to-severe carpal tunnel syndrome, a disability recognized by the ADA.

16.    On or about December 23, 2024, Plaintiff was cleared to return to work with restrictions, including limiting rapid and repetitive hand movements as well as a lifting/pushing/pulling restriction of no more than 10 pounds.

17.    On or about January 6, 2025, Plaintiff had a follow-up appointment with her physician who issued a modification to her restrictions by changing her lifting/pushing/pulling restriction to five (5) pounds.

18. Based on these restrictions, Plaintiff returned to work on January 9, 2025.

19. Upon returning to work, Plaintiff faced demeaning and inappropriate remarks from LaTasha Askew, HR representative, who asked Plaintiff questions like how she was able to do things like put on clothes and shoes, cook, and wash dishes if her "hands are messed up."

20. Plaintiff expressed her frustration with the workers' compensation process and detailed pain she was still experiencing in her hands, and Askew's response was to dismiss Plaintiff's concerns.

21. Plaintiff later emailed Askew in order to formally complain about the insensitive remarks.

22. On or about January 17, 2025, however, Plaintiff provided Defendants with another updated doctor's note that added the restriction of being limited to only working in areas of the plant that were above 65 degrees Fahrenheit.

23. On or about April 3, 2025, Plaintiff had another follow-up appointment with her physician who made modifications to her work restrictions, changing them to no heavy gripping as well as no rapid and repetitive hand movements.

24. Inadvertently, however, her physician left off the room temperature restriction.

25. On or about April 20, 2025, Plaintiff met with Supervisors Gaines, Santillan, and Adams to discuss her job duties.

26. Gaines, Santillan, and Adams told Plaintiff that since she was no longer under a temperature restriction, she could go back to work in the fractionation area.

27. Plaintiff realized that there must have been a mistake in the doctor's note and informed Gaines, Santillan, and Adams that she would need to leave her shift early and use sick time because she could not work in the cold fractionation area without significant pain.

28. Further, during the meeting with Gaines, Santillan, and Adams, Gaines told plaintiff that if she could provide him with her updated restrictions, including that she could no longer work in the cold room, he would honor it.

29. The next day, on April 21, 2025, Plaintiff presented Defendants with another updated note from her physician, which clearly stated that Plaintiff was "only to work in 70 degrees and above."

30. On or about April 22, Plaintiff was disciplined for insubordination and attendance for leaving her shift early, despite the availability of sick time and the clear error in her restrictions, especially considering that Defendants had since been presented with a doctor's note with the temperature restriction reinstated.

31.    Before she was written up, Plaintiff asked that she be given meaningful work or transferred to another department.

32.    Supervisor Gaines expressed willingness to help Plaintiff, but Askew insisted that the write-up be issued to Plaintiff, which, according to Defendants' policy, meant that for 12 months, Plaintiff "would be ineligible for promotion and transfer and excluded from the annual performance review and any compensation increases."

33.    This is plainly retaliatory since Plaintiff should not have been written up based on Gaines' assertion that he would honor her restrictions if she provided the correct doctor's note, which she did within a day of the interaction she was later written up for.

34.    On or about April 30, 2025, Plaintiff retained a workers' compensation attorney and retaliatory actions increased against her.

35.    On or about May 21, 2025, Plaintiff was denied free access to the computer lab she had previously been placed in to accommodate her restrictions.

36.    Instead, Plaintiff was locked in an isolated room and monitored by Sandra Todus, the Head of Security.

37.    Plaintiff could not enter or exit the room without sending daily Microsoft Teams messages or making phone calls requesting access, sometimes waiting for an hour or more for a response from management.

38.    On or about May 31, 2025, Plaintiff was denied a raise and bonus due to the disciplinary action she had been issued in April for refusing to work in the cold-room environment that was against her accommodations.

39.    On or about June 3, 2025, Plaintiff had a functional capacity evaluation ("FCE"), which is a comprehensive set of standardized physical tests used to measure an individual's safe functional capabilities, activity endurance, and physical work tolerances.

40.    On or about June 9, 2025, after the FCE, Plaintiff presented Defendants with a medical note establishing permanent restrictions of no lifting/pushing/pulling more than 20 pounds and only working in areas that were 70 degrees Fahrenheit or warmer.

41.    At that point, Defendants told Plaintiff that they could no longer accommodate her restrictions and could not transfer her to another position, despite her internal applications for other positions.

42.    Plaintiff was aware of job opportunities at the plant that were in areas that were not as cold as the fractionation area, including, for example, the

"IG" Department and the Technology Department, which she had been told by another Tech employee had openings.

43.    However, Plaintiff was not given the option of moving into those roles and was instead placed on administrative leave on or about June 13, 2025.

44.    Plaintiff was initially told that she would continue to be paid but later learned she had been placed on unpaid leave.

45.    On or about June 16, 2025, Plaintiff contacted HR again regarding her pay.

46.    HR retaliated against Plaintiff by failing to properly enter her time and pay out remaining wages owed, including accrued PTO and vacation time.

47.    Plaintiff later received retroactive pay and a bonus following an investigation; however, benefits were still improperly deducted.

48.    Plaintiff was never properly notified that she owed any insurance premiums and disputes that assertion, which was used to justify the improper deduction.

49.    On or about October 6, 2025, Plaintiff received a COBRA packet in the mail.

50.     This was the first notification had that her employment had been officially terminated, and Plaintiff never received any other explanation or information, including her separation notice.

51.     Plaintiff believes that she was actually terminated because of her disability and required accommodations.

## COUNT I
## DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

52.     Plaintiff incorporates by refence each and every preceding paragraph of this Complaint.

53.     Plaintiff has a disability as defined by the ADA.

54.     Plaintiff was qualified for his position.

55.     As detailed above, Plaintiff notified Defendants of his disability and requested accommodation.

56.     Very shortly after his disclosure, Plaintiff was terminated in violation of the ADA.

57.     As a direct and proximate result of Defendants' intentional discrimination, Plaintiff has suffered damages, including but not limited to loss of pay, job benefits, emotional distress, and all other damages allowed by law.

## COUNT II
## RETALIATION UNDER THE ADA

58.     Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

59.     Plaintiff engaged in protected activity under the ADA.

60.     As detailed above and in response, Defendants retaliated against Plaintiff.

61.     Specifically, Plaintiff was retaliated against when he was terminated.

62.     Defendants' actions constitute unlawful retaliation in violation of the ADA.

63.     Defendants willfully and wantonly disregarded Plaintiff's rights and Defendants' retaliation against Plaintiff was undertaken intentionally and in bad faith.

64.     As a result of Defendants' unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, significantly diminished employment opportunities, emotional distress consisting of, but not limited to, outrage, shock, and humiliation, inconvenience, loss of income, and other indignities.

WHEREFORE, Plaintiff demands a trial by jury and for the following relief:

(a)     that Summons issue;

(b)     that Defendant Employers be served with Summons and Complaint;

(c)     that a trial by jury to all issues be had;

(d)     that judgment against Defendants be issued for any and all damages available by law including but not limited to general, special, liquidated damages as allowed by law under each and every count and cause of action contained in this Complaint;

(e)     for injunctive and declaratory relief;

(f)     for all costs of this action to be taxed against Defendant Employer;

(g)     for all costs and attorney's fees to be awarded to Plaintiff; and

(h)     for any and all other and further relief as this Court may deem just and equitable under the circumstances.

Respectfully submitted this 27th day of May, 2026.

*s/J. Stephen Mixon, Esq.*
J. Stephen Mixon
Georgia Bar No. 514050
steve@mixon-law.com
Attorney for Plaintiff

The Mixon Law Firm
3344 Peachtree Rd. Suite 800
Atlanta, GA 30326
Phone: (770) 955-0100
steve@mixon-law.com